# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. Leda Dunn Wettre |
| v. | : Mag. No. 16-8190 |
| JOSEPH TAUB and ELAZAR SHMALO | : **CRIMINAL COMPLAINT** |

I, Matthew Mackowiak, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Matthew Mackowiak, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

December 9, 2016 at
Newark, New Jersey

_____
HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Conspiracy to Commit Securities Fraud

From at least as early as December 2013 through in or about December 2016, in the District of New Jersey, and elsewhere, defendants

**JOSEPH TAUB**
**and**
**ELAZAR SHMALO**

did knowingly and willfully combine, conspire, confederate and agree with each other and others to commit an offense against the United States, namely securities fraud, by using and employing through the direct and indirect use of the means and instrumentalities of interstate commerce and the mails, manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240-10b-5.

All in violation of Title 18, United States Code, Section 371.

### Overt Acts

In furtherance of the conspiracy and to effect its unlawful object, the following overt acts, among others, were committed in the District of New Jersey and elsewhere:

a. On or about January 8, 2015, TAUB logged into an account at Brokerage Firm 2 from an internet connection in New Jersey to engage in a Coordinated Trading Event in the securities of Company 1.

b. On or about June 18, 2015, TAUB logged into an account at Brokerage Firm 2 from an internet connection in New Jersey to engage in a Coordinated Trading Event in the securities of Company 2.

c. On or about September 25, 2015, SHMALO logged into an account at Brokerage Firm 5 from an internet connection in New Jersey to engage in a Coordinated Trading Event in the securities of Company 3.

## ATTACHMENT B

I, Matthew Mackowiak, am a Special Agent with the Federal Bureau of Investigation. I have participated in this investigation, discussed this matter with other law enforcement officers, and have reviewed documents and other materials. I have knowledge of the following facts. Because this Criminal Complaint is being submitted only for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part and all dates and figures are approximate.

## BACKGROUND

1. At all times relevant to this Criminal Complaint, unless otherwise indicated:

    a. Defendant JOSEPH TAUB ("TAUB") resided in or around Clifton, New Jersey, and was self-employed as a day trader of securities. TAUB had been a registered securities broker. TAUB passed the General Securities Representative Examination (the "Series 7") and the Limited Representatives Equity Trader Examination (the "Series 55"). The Series 7 and Series 55 examinations covered topics including prohibited manipulation of securities prices and the prohibition against the use of manipulative, deceptive, or other fraudulent devices.

    b. Defendant ELAZAR SHMALO ("SHMALO") resided in or around Passaic, New Jersey, and was a day trader of securities using funds provided by TAUB.

    c. CC-1, a co-conspirator not named as a defendant herein, resided in or around Cedarhurst, New York, and was TAUB's accountant.

    d. The NASDAQ Stock Market ("NASDAQ") was the largest electronic equity securities trading market in the United States and was the second largest equities-based exchange in the world based on market capitalization. NASDAQ relied on computer servers to facilitate trading activity. NASDAQ maintained computer servers in or around Carteret, New Jersey.

    e. The New York Stock Exchange ("NYSE") was the largest stock exchange in the United States based on market capitalization. NYSE performed trade processing and data services from in or around Mahwah, New Jersey.

    f. Company 1 was a public company located in or around Santa Monica, California. Securities of Company 1 were traded on the NASDAQ.

g.  Company 2 was a public company located in or around Ann Arbor, Michigan. Securities of Company 2 were traded on the NASDAQ.

h.  Company 3 was a public company located in or around Midland, Texas. Securities of Company 3 were traded on the NYSE.

i.  Brokerage Firm 1 was a brokerage firm located in or around New York, New York.

j.  Brokerage Firm 2 was a brokerage firm located in or around Omaha, Nebraska.

k.  Brokerage Firm 3 was a brokerage firm located in or around Boston, Massachusetts.

l.  Brokerage Firm 4 was a brokerage firm located in or around Saint Louis, Missouri.

m.  Brokerage Firm 5 was a brokerage firm located in or around San Francisco, California.

n.  Brokerage Firm 6 was a brokerage firm located in or around New York, New York. Brokerage Firms 1, 2, 3, 4, 5, and 6, among others, will be referred to collectively as the "Brokerage Firms."

o.  Financial Institution 1 was a financial institution as defined in Title 18, United States Code, Section 20, located in or around New York, New York.

p.  Financial Institution 2 was a financial institution as defined in Title 18, United States Code, Section 20, located in or around San Francisco, California.

q.  Financial Institution 3 was a financial institution as defined in Title 18, United States Code, Section 20, located in or around New York, New York.

r.  A "limit order" was an order to buy or sell a stock at a specific price or better. A buy limit order could only be executed at the limit price or lower, and a sell limit order could only be executed at the limit price or higher. A limit order was not guaranteed to execute.

s.  A "short sale" or "shorting" was the sale of a security that was not owned by the seller, or that the seller had borrowed.

## OVERVIEW

2. From at least as early as in or about December 2013 through in or about December 2016, TAUB, SHMALO and their co-conspirators (collectively the "Conspirators") orchestrated an extensive and sophisticated scheme to manipulate the prices of securities of numerous public companies traded on the NYSE and NASDAQ by coordinating trading in dozens of brokerage accounts that they controlled. The Conspirators generally targeted companies whose securities were thinly traded because it was easier to manipulate the prices of securities with smaller volumes. Through their coordinated trading, the Conspirators injected false information into the market about the supply and demand of these securities and thereby artificially inflated their prices. They then profited handsomely by selling, at the artificially inflated prices, shares they had accumulated at lower prices. In 2014 and 2015 alone, the Conspirators engaged in more than 23,000 instances of manipulative trading (the "Coordinated Trading Events"), during which they bought and sold approximately $10 billion worth of securities and made more than approximately $26 million in illegal trading profits.

## THE SCHEME TO DEFRAUD

3. The Conspirators' manipulative trading relied primarily on prearranged and/or coordinated trading among more than 35 brokerage accounts controlled by the Conspirators (collectively the "Coordinated Trading Accounts"). The Coordinated Trading Accounts were held in the Conspirators' own names, the names of their family members (including minor children, spouses, and parents), and the names of entities the Conspirators controlled. Many of the Coordinated Trading Accounts were opened in the names of individuals who neither controlled the accounts nor traded the securities held in the accounts (the "Straw Account Holders"). TAUB funded many of the Coordinated Trading Accounts that were not in his name, and used the Straw Account Holders in an effort to conceal the scheme from regulators and law enforcement, among others.

4. The Coordinated Trading Events generally involved two or more Coordinated Trading Accounts that bought and sold the same thinly-traded stock on the same day during the same period of time. For each Coordinated Trading Event, at least one account was primarily used to place multiple smaller orders to create upward or downward price pressure (the "helper account") and one other account was primarily used to buy and sell larger quantities of stock (the "winner account"). The winner accounts profited by buying and selling at prices affected by the manipulative orders in the helper accounts. To further mask the illicit coordination between the two types of accounts, the helper and winner accounts used by the Conspirators in each Coordinated Trading Event were almost always held at different Brokerage Firms. The helper accounts frequently broke even or lost money – but when

4

viewed in conjunction with the winner accounts, the Conspirators profited overall.

5. The Coordinated Trading Events nearly always lasted just a few minutes each. During Coordinated Trading Events, the Conspirators sometimes controlled more than 80% of the volume of a targeted stock and traded in several Coordinated Trading Accounts simultaneously. Most Coordinated Trading Events involved dozens of orders and the purchase and sale of at least thousands of shares of targeted stocks.

6. In a typical Coordinated Trading Event, the Conspirators first created an artificially lower market price for a thinly-traded stock by placing multiple small sell orders in one or more helper accounts. This was intended to create a false appearance of interest to sell the stock and to induce other market participants to execute against buy orders that the Conspirators then entered in the winner account at artificially low prices. After the winner account successfully accumulated its position, the Conspirators cancelled any open helper account sell orders. Then, the Conspirators repeated the same manipulation, in reverse, to sell the stock held in the winner accounts at an artificially high price and reap their illegal profit. The Conspirators first typically placed a series of smaller buy orders in one or more helper accounts, typically at progressively higher prices. Entering the orders this way was intended to create the false appearance of buy interest and induce other market participants to execute against sell orders that the Conspirators then entered in the winner account at artificially high prices. After the winner account successfully sold its stock, the Conspirators cancelled any remaining open helper account buy orders and liquidated the smaller position accumulated in the helper accounts. In the vast majority of Coordinated Trading Events, the gains in the winner accounts far exceeded the losses incurred in the helper accounts.

7. The Conspirators' repetition of this manipulative trading pattern thousands of times illustrates their intent to illegally manipulate the stock prices for their own benefit at the expense of other market participants, who executed against the winner account orders at artificially-created prices driven by the helper account orders.

8. The Conspirators generated a net profit from these Coordinated Trading Events more than 80% of the time. The Conspirators profited, on average, approximately $1,400 per successful Coordinated Trading Event. Because of the massive number of Coordinated Trading Events, the Conspirators made more than $26 million in illicit trading profits in 2014 and 2015.

## EXAMPLES OF MANIPULATIVE TRADING

### Company 1 – January 8, 2015

9. On January 8, 2015, the Conspirators engaged in approximately five Coordinated Trading Events in the stock of Company 1. The Conspirators used five different Coordinated Trading Accounts at three different Brokerage Firms trading in parallel to execute these Coordinated Trading Events, but all five of the accounts were funded and controlled by the same Conspirators. Each of these Coordinated Trading Events took just minutes to execute completely.

10. For example, one of the Coordinated Trading Events in the stock of Company 1 on January 8, 2015 took place from approximately 11:46 a.m. through 11:48 a.m.

   a. The trading began with a helper account placing approximately 6 separate limit orders to sell ("short") the stock in an effort to drive the price down. All but one of these orders were cancelled before they were executed (but largely after the winner account had purchased its shares); however, by the time the first purchase was made in the winner account, the price of the stock of Company 1 had decreased by approximately $.23 per share.

   b. Once the price was reduced, the winner account acquired approximately 7,200 shares of the stock of Company 1 by placing approximately four separate market buy orders.

   c. Interspersed with the buy orders placed by the winner account, one of the helper accounts placed approximately four more sell orders – and unlike the helper account's original sell orders, all of these orders were executed. Therefore, the winner account and the helper account – both controlled by Conspirators – were trading in opposite directions in the stock of Company 1 within seconds of each other.

   d. As soon as the winner account completed its purchases, the helper account promptly cancelled the remaining limit orders to short the stock that had not yet been executed and reversed course: two helper accounts now rapidly placed approximately 20 separate limit orders to buy the stock at prices above the winner account's purchase price. These orders were entered to make it appear that there was growing interest in the stock. As

    the helper accounts' buy orders were placed, the price of the stock of Company 1 rose approximately $.50.

  e. Once the price of Company 1's stock rose, the winner account sold all of its shares for a profit of approximately $3,285. While the winner account was selling at the artificially-inflated price, one of the helper accounts placed approximately three buy orders interspersed with the winner account's sell orders. Again, here, the winner account and the helper account – both controlled by the Conspirators – were trading in opposite directions in the stock in approximately six separate trades, all executed within seconds.

  f. Once the winner account had completed its sales and locked in its profits, the helper accounts cancelled all of their buy limit orders that had not yet been executed, ending with losses of approximately $261.

  g. During the approximately two minutes that this Coordinated Trading Event lasted, the Conspirators controlled approximately 76% of the trading volume in the stock of Company 1.

11. The Coordinated Trading Event discussed in detail above was far from the Conspirators' only manipulative trading on January 8, 2015. Indeed, on that date, the Conspirators engaged in a total of approximately 51 other Coordinated Trading Events, in approximately 41 different stocks, for a total profit of approximately $70,545.

### *Company 2 – June 18, 2015*

12. On June 18, 2015, the Conspirators engaged in approximately twelve Coordinated Trading Events in the stock of Company 2. The Conspirators used four different Coordinated Trading Accounts at two different Brokerage Firms trading in parallel to execute these Coordinated Trading Events, but all four of the accounts were funded and controlled by the same Conspirators. Each of these Coordinated Trading Events took just minutes to execute completely.

13. For example, one of the Coordinated Trading Events in the stock of Company 2 on June 18, 2015 took place from approximately 9:54 a.m. through 9:56 a.m.

  a. The trading began with a helper account placing approximately 6 separate limit orders to sell ("short") the stock in an effort to drive the price down. By the time the first purchase was made

in the winner account, the price of the stock of Company 2 had gone down by approximately $.28 per share.

b. Once the price was reduced, the winner account acquired approximately 7,300 shares of the stock of Company 2 by placing approximately seven separate market buy orders.

c. Interspersed with the buy orders placed by the winner account, the helper account placed approximately four more sell orders. Therefore, the winner account and the helper account – both controlled by Conspirators – were trading in opposite directions in the stock of Company 2 within seconds of each other.

d. As soon as the winner account completed its purchases, the helper account promptly cancelled its remaining limit orders to short the stock and reversed course: it rapidly placed approximately 18 separate limit orders to buy the stock at prices above the winner account's purchase price. These trades were entered to make it appear that there was growing interest in the stock. As the helper account's buy orders were placed, the price of the stock of Company 2 rose approximately $.51.

e. Once the price of Company 2's stock rose, the winner account sold all of its shares for a profit of approximately $4,927. While the winner account was selling at the artificially-inflated price, the helper account placed approximately six buy orders interspersed with the winner account's sell orders. Again, here, the winner account and the helper account – both controlled by the Conspirators – were trading in opposite directions in the stock in approximately ten separate trades, all executed within seconds.

f. Once the winner account had completed its sales and locked in its profits, the helper account cancelled all of its buy limit orders that had not yet been executed, ending with a loss of approximately $314.

g. During the approximately two minutes that this Coordinated Trading Event lasted, the Conspirators controlled approximately 57% of the trading volume in the stock of Company 2.

14. The Coordinated Trading Event discussed in detail above was far from the Conspirators' only manipulative trading on June 18, 2015. Indeed, on that date, the Conspirators engaged in a total of approximately 45 other Coordinated Trading Events, in approximately 26 different stocks, for a total profit of approximately $83,697.

### Company 3 – September 25, 2015

15.   On September 25, 2015, the Conspirators engaged in a Coordinated Trading Event in the stock of Company 3. The Conspirators used two different Coordinated Trading Accounts at two different Brokerage Firms trading in parallel to execute this Coordinated Trading Event, but the accounts were funded and controlled by the same Conspirators. This Coordinated Trading Event took just minutes to execute completely.

16.   The Coordinated Trading Event took place from approximately 9:50 a.m. through 9:54 a.m.

   a. The trading began with the helper account placing approximately 21 separate limit orders to sell ("short") the stock in an effort to drive the price down. Approximately five of these orders were cancelled before they were executed (but after the winner account had purchased some of its shares); however, by the time the first purchase was made in the winner account, the price of the stock of Company 3 had decreased by approximately $.58 per share.

   b. Once the price was reduced, the winner account acquired approximately 17,000 shares of the stock of Company 3 by placing approximately 11 separate market buy orders.

   c. The helper account abruptly cancelled certain of its limit orders to short the stock and reversed course: it rapidly placed approximately 32 separate limit orders to buy the stock at prices above the winner account's purchase price. These trades were entered to make it appear that there was growing interest in the stock. As the helper account's buy orders were placed, the price of the stock of Company 3 rose approximately $1.57.

   d. Once the price of Company 3's stock rose, the winner account sold all of its shares within approximately 36 seconds for a profit of approximately $24,501. While the winner account was selling at the artificially-inflated price, the helper account placed approximately seven buy orders interspersed with the winner account's sell orders. Again, here, the winner account and the helper account – both controlled by the Conspirators – were trading in opposite directions in the stock in approximately fourteen separate trades, all executed within seconds.

e. Once the winner account had completed its sales and locked in its profits, the helper account cancelled all of its buy limit orders that had not yet been executed, ending with a loss of approximately $3,339.

f. During the approximately two minutes that this Coordinated Trading Event lasted, the Conspirators controlled approximately 87% of the trading volume in the stock of Company 3.

17.  The Coordinated Trading Event discussed in detail above was far from the Conspirators' only manipulative trading on September 25 2015. Indeed, on that date, the Conspirators engaged in a total of approximately 40 other Coordinated Trading Events, in approximately 19 different stocks, for a total profit of approximately $104,822.

## CONCEALMENT OF THE SCHEME

18.  The Conspirators took various steps to conceal their illegal conduct from law enforcement and regulators, among others, including: setting up Coordinated Trading Accounts in the names of Straw Account Holders (both individuals and shell companies) that TAUB and others in fact controlled; paying the Straw Account Holders a percentage of the profits earned in their accounts; causing the Straw Account Holders to make false statements to the Brokerage Firms that concealed the Conspirators' connections to the accounts; coordinating responses to Brokerage Firms that questioned the Conspirators' trading; and using multiple Coordinated Trading Accounts at different Brokerage Firms to carry out the manipulative trading so that the activity in each account, when viewed in isolation, would appear less suspicious.

### *Hiding Who Controlled Brokerage Accounts*

19.  For example, TAUB and CC-1 used an entity called EAC Capital to disguise the coordinated nature of certain Conspirators' trading. On or about December 31, 2013, CC-1 incorporated EAC Capital in New York. Emails sent as part of the scheme demonstrate how the Conspirators sought to hide the true owners of certain EAC Capital Coordinated Trading Accounts. On or about September 28, 2014, CC-1 emailed TAUB, stating that it might appear suspicious for CC-1's name to be on the LLC documents for EAC Capital, but for TAUB to be the only user on a Coordinated Trading Account in the name of EAC Capital. TAUB instructed CC-1 to wait longer until opening the brokerage account because they "don't want it to be suspicious." In or about December 2014, CC-1 did indeed open a Coordinated Trading Account at Brokerage Firm 1 for EAC Capital (the "EAC Capital Brokerage Firm 1 Account").

20.  TAUB and CC-1 also took steps to conceal that TAUB was controlling the EAC Capital Brokerage Firm 1 Account. On or about December

10, 2014, CC-1 submitted the account opening forms for the EAC Capital Brokerage Firm 1 Account, which listed CC-1 and one of TAUB's family members as the account owners but did not identify TAUB as an account owner or authorized trader. Having just made these misrepresentations on the account forms, CC-1 immediately provided the account's login credentials to TAUB and TAUB repeatedly engaged in Coordinated Trading Events in the account. CC-1 regularly acted as a front for TAUB in dealings with Brokerage Firm 1 to hide TAUB's control. For example, with respect to the EAC Capital Brokerage Firm 1 Account, CC-1 posed questions that TAUB had instructed CC-1 to ask, and answered Brokerage Firm 1's questions with answers that TAUB drafted, without disclosing to Brokerage Firm 1 TAUB's behind-the-scenes role in both the communications and the trading itself. Throughout their market manipulation scheme, TAUB and CC-1 repeatedly engaged in this pattern of deception, with multiple Brokerage Firms.

21.   TAUB and CC-1 also took steps to conceal that TAUB was funding the EAC Capital Brokerage Firm 1 Account. For example, and among other things:

   a. On or about December 14, 2014, CC-1 forwarded to TAUB an email from Brokerage Firm 1 indicating that the EAC Capital Brokerage Firm 1 Account had been opened.

   b. On or about December 31, 2014, TAUB caused two checks totaling approximately $175,000 to be deposited into a bank account at Financial Institution 1 in the name of EAC Capital and CC-1 (the "EAC Financial Institution 1 Account") from two accounts TAUB controlled at Brokerage Firm 2 (the "Taub Brokerage Firm 2 Account") and Financial Institution 2.

   c. On or about January 5, 2015, CC-1 caused a wire of approximately $174,025 to be sent from the EAC Financial Institution 1 Account to the EAC Brokerage Firm 1 Account. Therefore, to Brokerage Firm 1, the EAC Brokerage Firm 1 Account appeared – falsely – to properly be funded by one of the account owners, when in fact the money came from TAUB.

   d. The same day, CC-1 emailed TAUB informing him that the funds would be in the EAC Brokerage Firm 1 Account the next day.

22.   The EAC Brokerage Firm 1 Account thereafter operated as one of the Coordinated Trading Accounts and was used to trade in coordination with other Coordinated Trading Accounts in furtherance of the scheme.

11

23. TAUB also controlled certain Coordinated Trading Accounts held in his wife's name in furtherance of the scheme. For example, on or about March 26, 2015, TAUB called Brokerage Firm 5 regarding one of the Coordinated Trading Accounts in his wife's name and pretended to be his wife – when asked to identify himself, TAUB gave his wife's name, date of birth, and mother's maiden name. TAUB also posed as his wife in calls with Brokerage Firm 5 on or about the following dates: March 25, 2015; March 27, 2015; September 30, 2015; October 8, 2015; and November 3, 2015. This account also was used to trade in coordination with other Coordinated Trading Accounts in furtherance of the scheme.

24. TAUB also controlled other Coordinated Trading Accounts held in CC-1's name in furtherance of the scheme. For example, on or about February 3, 2014, TAUB received an email from an individual who set up Coordinated Trading Accounts for the Conspirators with information about a new Coordinated Trading Account opened in the name of CC-1. The e-mail read as follows:

> You can start using new sub today, fresh for brand new month. Brand new log-in, brand new sub make [CC-1] some $ with this sub.

TAUB responded and indicated that he had started trading in the new Coordinated Trading Account opened in the name of CC-1.

25. TAUB and SHMALO also funded certain Coordinated Trading Accounts held at Brokerage Firms 2, 3, 4, and 5 in Straw Account Holder 1's name as recently as July 2016. TAUB and SHMALO funded these accounts in a manner designed to disguise the true source of the funding. For example, TAUB and SHMALO transferred hundreds of thousands of dollars from accounts they controlled to bank accounts in Straw Account Holder 1's name. Straw Account Holder 1 then transferred the money from Straw Account Holder 1's bank account into Straw Account Holder 1's brokerage account, to make it appear that the money was originating from Straw Account Holder 1. In addition, on the account opening documents for an account at Brokerage Firm 4, Straw Account Holder 1 indicated that the source of funds for the account was "savings" and concealed the fact that TAUB and SHMALO were funding the account.

26. After the account was opened and began to trade with a high success rate, Brokerage Firm 4 called Straw Account Holder 1 and asked if Straw Account Holder 1 used any tools to help trade. Straw Account Holder 1 responded that Straw Account Holder 1 used a tool outside of Brokerage Firm 4, but that it was proprietary information and that Straw Account Holder 1

would rather not discuss it.

27.  TAUB also funded accounts held in SHMALO's name. Emails show that on or about September 30, 2014, TAUB and SHMALO agreed that TAUB would provide SHMALO with funds to trade at TAUB's direction. Initially, TAUB provided approximately $330,000 to fund certain Coordinated Trading Accounts held in SHMALO's name.

28.  TAUB then continued to fund SHMALO's trading. Among other things:

   a. On or about November 4, 2014, TAUB caused approximately $50,000 to be deposited into a bank account at Financial Institution 3 in the name of a relative of SHMALO (the "Shmalo Relative Financial Institution 3 Account") from a Financial Institution 2 bank account he controlled (the "Taub Financial Institution 2 Account"). On or about November 18, 2014, a wire transfer of approximately $50,000 was made from an account belonging to the relative of SHMALO to a joint account at Brokerage Firm 1 in the name of SHMALO and the relative (the "Shmalo Brokerage Firm 1 Account"). Therefore, to Brokerage Firm 1, the Shmalo Brokerage Firm 1 Account appeared – falsely – to properly be funded by one of the account owners.

   b. On or about December 22, 2014, a $40,000 check was sent from the Taub Financial Institution 2 Account to a bank account at Financial Institution 3 controlled by SHMALO (the "Shmalo Financial Institution 3 Account"). On or about December 24, 2014, a $40,000 wire was sent from the Shmalo Financial Institution 3 Account to the Shmalo Brokerage Firm 1 Account. Therefore, to Brokerage Firm 1, the Shmalo Brokerage Firm 1 Account again appeared – falsely – to properly be funded by one of the account owners, when in fact the money came from TAUB.

29.  During the course of the conspiracy, SHMALO reported to TAUB and frequently emailed TAUB a summary of his trading for the day. TAUB and SHMALO agreed that SHMALO would receive approximately one-third of the profits for the trading in his Coordinated Trading Accounts.

30.  TAUB tasked CC-1 with calculating the profit and loss numbers for several of the Coordinated Trading Accounts, including SHMALO's. For example, on or about December 30, 2015, CC-1 emailed SHMALO and TAUB with the profit and loss numbers for SHMALO. The attached spreadsheet indicated that SHMALO had earned approximately $225,140 from on or about

September 1, 2015 through on or about November 30, 2015 and that his 35% cut amounted to approximately $78,799.

### *Warnings from Brokerage Firms; Coordinating Responses*

31.    Notwithstanding the Conspirators' efforts to conceal their coordination, the Brokerage Firms warned them repeatedly against engaging in trading that was, or appeared to be, manipulative. For example, on or about December 5, 2014, Brokerage Firm 2 sent a message to a Coordinated Trading Account controlled by TAUB with the subject "Avoiding manipulative trading and high risk factors." The message stated that "[m]anipulative trading practices involve the purchase, sale, or other transactions in any security for the purpose of: creating or inducing a false, misleading, or artificial appearance of activity in the security[;] unduly or improperly influencing the market price of the security [and] setting a price that does not reflect the true state of the market in the security."

32.    The Brokerage Firms also warned SHMALO. For example, on or about February 24, 2015, Brokerage Firm 1 emailed SHMALO and warned him that trading in the Shmalo Brokerage Firm 1 Account on or about February 20, 2015 appeared manipulative. Specifically, Brokerage Firm 1 stated, "[y]ou cannot enter orders at the same price Level and use separate Market Centers, this gives the appearance of the Bid being stronger than it normally would be and then cancel these bids and sell at an artificially higher level."

33.    In response to this warning, the Conspirators coordinated with each other on how to respond. On or about February 24, 2015, SHMALO sent TAUB an email with a draft of the email SHMALO proposed sending to Brokerage Firm 1 in response to its warning. The draft response read: "I am very sorry about these occurrences. It was not my intention nor my knowledge that this activity would be interpreted or considered to be layering. i'm very sorry about this, I'll make sure it doesn't happen again."[1] SHMALO sent this message to Brokerage Firm 1 later the same day.

---

[1]    "Layering" is a form of manipulative securities trading. In a layering scheme, a trader places non-bona fide orders to buy or sell securities and then quickly cancels them before they are executed. The purpose of these non-bona fide orders is to move the price of a security up (in the case of non-bona fide buy orders) or down (in the case of non-bona fide sell orders) in an artificial manner, rather than through real market demand, and to induce other market participants to buy or sell a security at a price not representative of actual supply or demand. While the non-bona fide orders are pending, the trader simultaneously executes trades based on bona fide orders in order to profit from the artificial movement of the share price that the trader created.

34. On or about February 26, 2015, Brokerage Firm 1 emailed SHMALO and warned him again about his trading:

> You can buy and sell, what you must avoid is entering numerous orders on one side making a new inside NBBO on various exchanges to create the false appearance of demand on one side in order to execute at the artificially inflated price on the opposite of the market i.e. sell. (like was done in the AAWW and STON trades). No one is telling you that you can't buy and then sell. You can't trade in [a] manner that could appear to be manipulative. [2]

35. Ignoring this warning, SHMALO continued to conduct manipulative trading. This resulted in an additional warning from Brokerage Firm 1 on or about May 12, 2015:

> The Regulators could very well view this order entry; multiple shorts using numerous ECN'S at numerous Levels down to a buy order with reserve, or hidden buy as a manipulative effort. You must enter only Bonafide Orders, orders that are intended to be executed against. By driving down the market and then mass canceling the short orders the Regulators could view the short orders as Non Bonafide.
>
> You were previously warned regarding the same order entry pattern in symbols "AAWW and "STON" on 2-20-2015, this is YOUR FINAL WARNING, any additional violations and your account will be closed. [3]

36. Because the Conspirators ignored the Brokerage Firms' repeated warnings and continued to engage in manipulative trading, the Brokerage Firms closed numerous Coordinated Trading Accounts. After Brokerage Firms closed certain Coordinated Trading Accounts, the Conspirators simply switched

---

[2] The National Best Bid and Offer ("NBBO") is the best available ask price and the best available bid price available to investors when they buy and sell securities. The NBBO is the bid and ask price that is seen by the average investor.

[3] A "bona fide order" is an order for the purchase or sale of securities that a trader intends to be executed. A "non-bona fide order" is an order for the purchase or sale of securities that, at the time it was placed, a trader intended to cancel before execution.

An Electronic Communication Network ("ECN") is an automated system that matches buy and sell orders for securities.

15

to new Brokerage Firms and opened new Coordinated Trading Accounts in the names of yet other Straw Account Holders, concealing their relationship to the new accounts and continuing the manipulative trading scheme. In an email chain on or about March 2, 2016, TAUB discussed the plan for opening a new account with one of the Straw Account Holders. First, the Straw Account Holder thanked TAUB for his recent payment and said "[h]eard that [Brokerage Firm 4] is the next stop. Hope it's a good one." In response, TAUB replied "[y]ea keep on praying for this so we can make it last! They're not too happy when we are too successful :)"